## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **STEVEN PERKINS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 09-466 (RMC)** |
| | ) | |
| **FORT LINCOLN II CONDOMINIUM** | ) | |
| **ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Steven Perkins and Lenya Gregory-Perkins brought suit against the Fort Lincoln II Condominium Association alleging race discrimination in violation of 42 U.S.C. § 1981 of the Civil Rights Act of 1964, as amended, along with three causes of action under District of Columbia law. After Defendant's motion for summary judgment became ripe, the Court ordered the parties to file supplemental briefs to address further whether Plaintiffs have standing to litigate their sole federal claim. The Court finds Plaintiffs lack standing to pursue a claim under § 1981, and that even if they had standing, Defendant is entitled to summary judgment. The Court will dismiss the § 1981 claim. Without a basis for federal jurisdiction, the Court will decline to exercise supplemental jurisdiction over the remaining counts arising under District of Columbia law. These remaining counts will be dismissed without prejudice.

## I. FACTS

Certain facts underlying this case are undisputed and others are hotly contested. The Court provides all sides but finds that the differences are immaterial to the legal issues.

The following facts are not in dispute. Plaintiffs are husband and wife, both African-American residents of the District of Columbia. Mr. Perkins purchased a condominium at Fort Lincoln II (New Town) Condominiums in January 2008. Fort Lincoln II Condominiums are located in and around the 2800 block of 31st Place in Northeast D.C. Specifically, Mr. Perkins's unit is located at 2867 31st Place. Mr. Perkins is the sole owner of the unit. Defendant Fort Lincoln II Condominium Association (the "Association") is a private homeowners association incorporated and doing business in the District. It governs the Fort Lincoln II Condominiums complex. The complex is managed by Vista Management.

The Association's Bylaws and Rules and Regulations ("Rules") govern the unit owners at Fort Lincoln II Condominiums. Mr. Perkins knew that he would be subject to the Rules when he purchased the unit. However, he did not receive a copy of the Rules at settlement on the condominium in January 2008, but the real estate agent told him that he would receive a packet with such information. Mr. Perkins did not make immediate efforts to obtain a copy of the Rules, at least in part because no one was expected to move into the unit immediately. Mr. Perkins received an email forwarding the nineteen-page set of Rules no later than May 16, 2008. The Rules contain a table listing the categories of violations and the range of possible fees imposed for each category of violation. The Rules enumerate possible violations, which among other things include noise disturbances, nuisances and offensive activity which disturbs residents, parking lot rules violations, articles left in or on common grounds, failure to have a copy of a rental/lease agreement on file with management or failure to submit a copy upon request from the Association, and failure to provide current contact information upon request, all of which can be enforced by fines. Mr. Perkins does not contend that the Rules were not properly adopted.

Mr. Perkins's unit remained vacant from January to June 2008, when he rented it to Talatha Carter, an African-American woman, and her two sons. Ms. Carter rented the unit under the Department of Housing and Urban Development Section 8 Tenant-Based Assistance Housing Choice Voucher Program ("Section 8").[1] The instant dispute centers on $3,300.00 in fines and $800.00 in legal fees that were assessed against Mr. Perkins by the Association for violations of the Rules stemming from Ms. Carter's tenancy. During this time, every unit but one at Fort Lincoln II Condominiums was owned and occupied by African-Americans; all persons mentioned by name herein are African-American, and the entire board of the Association was made up of African-Americans.

It is undisputed that on June 6, 2008, at about 4:30 p.m., Ms. Carter, her sons, and some movers began moving her belongings into the unit from a mid-sized moving truck. Ms. Carter parked her car in the parking space assigned to the unit. The moving truck was apparently parked so that it blocked a parking space belonging to Hazel Bell, which prevented her husband from parking in that space until the truck was emptied, a period of at least a few minutes. Ms. Bell promptly sent an email to the Association's board and called board member Leila Odom to complain. That evening, Ms. Odom sent an email to Mr. Perkins to remind him about parking lot rules and his failure to submit a lease agreement for the unit.

The parties proffer additional, disputed facts to explain the incident. Ms. Bell recalls that the moving truck was parked in her space and the space of another tenant during the afternoon

---

[1] Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq*., as repeatedly amended, authorizes the largest of Section 8 programs—the Housing Choice Voucher Program—which pays a large portion of the rents of low-income households directly to private landlords. This "tenant-based" rental assistance provides the tenants with greater freedom to move from one unit to another.

and that the movers had parked their cars in the spaces of two other tenants. Ms. Bell asked the movers to move the truck but they refused, and refused again later in the day when Mr. Bell returned home and needed to park. Ms. Carter, on the other hand, acknowledges that Ms. Bell's parking space was blocked, but explains that when Ms. Bell approached her to complain, Ms. Carter told her that they needed to move in and Ms. Bell agreed to let the truck occupy her space until her husband returned. Ms. Carter recalls that when Mr. Bell returned home only a few items were left to be moved, so he kindly waited and let them finish their move; he only had to wait a few minutes before being able to park his car in the Bells' designated space. Ms. Carter apologized several times to the Bells.

Undisputed is that Ms. Carter returned a second time to finish her move at approximately 7:00 p.m. the same day. This time, even though the moving truck parked in a "no parking zone," Ms. Odom found her parking space blocked when she returned home. The situation led to an argument, apparently between Ms. Carter's sons, the moving men, Ms. Odom, and others. Ms. Carter was called outside, where Ms. Odom told Ms. Carter that she could not park in her designated space. Ultimately, Ms. Odom called the police, who came to the scene. Ms. Odom sent an email to Vista Management and the Association to complain of the second incident, and also sent Mr. Perkins an email the next morning.

The parties offer supplemental, disputed facts about this second incident. Ms. Odom says that when she returned home, she merely asked the people unloading the moving truck to pull it forward so she could park. The movers belligerently told her she had to wait or park elsewhere. She called the police and again asked the movers to allow her to park in her space. Ms. Odom remembers that even Ms. Carter personally told her she had to wait, and that the movers' behavior

was threatening, boisterous and profane.

Ms. Carter was inside when the dispute began and is unsure whether her sons or anyone else threatened any of the residents. Her account is that when she came outside and encountered Ms. Odom, she asked Ms. Odom how she could move in without blocking the space. Ms. Odom responded that Ms. Carter could not park in her designated parking space, that Ms. Carter was supposed to park in the street, and that she was going to call the police. Ms. Carter then responded: "fine call [the] police." Pls.' Opp'n to Def.'s Mot. for Summ. J. [Dkt. # 22] ("Pls.' Opp'n"), [Attach. 6] Talatha Carter Witness Statement at 3. According to Ms. Carter, Ms. Odom continued: "You guys are not suppose [sic] to be up here anyway because you are ghetto. This is for [] a new high class upper N.E. neighbor [sic]. There are people who own their houses around here. We have $400,000.00 houses around here." *Id*. at 4.

On either June 7 or 8, Ms. Carter and her son were bringing in groceries when a grocery bag ripped and some items spilled onto the parking lot. Ms. Carter gave her son a shovel and some hot water to clean up, and says that her son did the best he could to remove any debris. On June 9, Ms. Bell complained by email to the Association's board that she had observed Ms. Carter's son drop grocery items in the parking lot without cleaning them up. Ms. Bell further complained that Ms. Carter's son had left a bottle of window cleaner in Ms. Carter's designated parking space. On June 10, Mr. Perkins's real estate agent delivered a copy of the Rules and other condominium documents to Ms. Gregory-Perkins. Ms. Gregory-Perkins then delivered these documents to Ms. Carter and discussed the Association Rules with her. The lease was executed that day.

As early as February 2008, Mr. Perkins had been notified by Vista Management that

if he were to rent the unit he would need to provide a copy of a valid lease agreement to the Association. Mr. Perkins does not recall whether he submitted the proposed lease with Ms. Carter to the Association prior to its execution. Mr. Perkins believes he submitted a copy of the executed lease to the Association sometime in mid-June, whereas the Association claims Mr. Perkins did not submit a copy of the lease to the Association until July 8, 2008. Further, on June 4, the Association had sent an email to Mr. Perkins, asking for his mailing address since he did not reside in the unit. Mr. Perkins emailed his home address to the Association on June 10.

By letter dated June 11, 2008, the Association fined Mr. Perkins for violations of the Rules associated with these events. In total, Mr. Perkins was fined $3,300.00 for various violations. The fines included: (a) $300.00 for failure to timely provide the Association with a copy of the lease and additional items requested; (b) $300.00 for failure to provide the Association with Mr. Perkins's contact information; (c) $1,800.00 representing six violations for keeping six unit owners from parking in their designated parking spaces, each violation prompting a $300.00 fine, all arising from the day Ms. Carter moved into the unit; (d) $300.00 for the alleged offensive conduct of the movers on the day of the move; (e) $300.00 for the loud profanities uttered by those involved in the move; and (f) $300.00 for the debris and bottle of window cleaner left in the parking lot by Ms. Carter's son.

Mr. Perkins requested a hearing on the assessed fines, which occurred on September 11, 2008. The Association's board met on October 7, 2008, upheld the fines, and included $800.00 in legal fees incurred by the Association due to the request for a hearing. The Carters moved out of the unit in September 2009, some months after their one-year lease expired.

Plaintiffs filed suit against the Association on March 10, 2009, alleging race

discrimination in violation of 42 U.S.C. § 1981; discrimination based on race and source of income

in violation of the D.C. Human Rights Act, D.C. Code § 2-1402 *et seq*.; and breach of contract. *See*

Compl. [Dkt. # 1]. After mediation, the Association filed a counterclaim against Plaintiffs alleging

breach of contract. *See* Order, Def.'s Counterclaim [Dkts. ## 14, 15]. The parties engaged in

discovery after which the Association filed a motion for summary judgment. *See* Def.'s Mot. for

Summ. J. [Dkt. # 21]. The Court denied the Association's motion for summary judgment without

prejudice on July 30, 2010, after determining that supplemental briefing was needed to address

whether Plaintiffs have standing to bring their federal claim under 42 U.S.C. § 1981.

## II. LEGAL STANDARDS

### A. Standing

As a matter of basic constitutional law, federal courts are limited to deciding cases

and controversies, and the issue of standing is one feature of such limitation. *Am. Legal Found. v.*

*FCC*, 808 F.2d 84, 88 (D.C. Cir. 1987) (citing *Valley Forge Christian College v. Americans United*

*for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). A plaintiff's standing under

Article III of the Constitution must be determined first in order to establish the jurisdiction of a court

to hear the case and reach the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101

(1998). Accordingly, standing cannot be waived by the parties, *see, e.g., Haase v. Sessions*, 835 F.2d

902, 906 (D.C. Cir. 1987), and a court has an independent obligation to inquire into its jurisdiction

even when the parties do not raise the issue. *United States v. Hays*, 515 U.S. 737, 742 (1995).

Standing focuses on whether the plaintiff has "alleged such a personal stake in the

outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify

exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99

(1975) (internal quotation marks omitted). Accordingly, standing "often turns on the nature and source of the claim asserted." *Id*. at 500. To establish the minimum constitutional requirements of Article III standing, a plaintiff must demonstrate that: "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

However, a "plaintiff's standing to sue under a statute ordinarily involves both constitutional and prudential components." *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Even after Article III's case or controversy requirement has been met, there may still linger the question of prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The Supreme Court has explained:

> Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen*, 468 U.S. at 751). Accordingly, even "'in cases concededly within our jurisdiction under Article III,'" we will decline to decide the merits of a case when these 'prudential standing' requirements are not satisfied." *Lozano v. City of Hazleton*, 620 F.3d 170, 183 (3d Cir. 2010) (quoting *Elk Grove*, 542 U.S. at 11).

-8-

The party claiming federal jurisdiction bears the burden of establishing Article III standing. *Mudd v. White*, 309 F.3d 819, 823 (D.C. Cir. 2002). "[T]he burden of production a plaintiff must bear in order to show it has standing to invoke the jurisdiction of the district court varies with the procedural context of the case." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). "On a motion for summary judgment, however, the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted)). Therefore, a plaintiff at summary judgment must be able to point to sufficient evidence in the record to support standing. *Id.*

## B. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that when a movant has satisfied his burden under Rule 56, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

## III. ANALYSIS

### A. Standing

The Plaintiffs appear to base their federal claim on a principle of third party standing. *See* Compl. ¶¶ 4-28. Plaintiffs initially asserted that the Association "unlawfully discriminated against plaintiffs in housing because of *their* race, when it imposed duties, terms and conditions of [sic] under the Bylaws of their homeowners' association, without cause or justification, in violation of 42 U.S.C. § 1981." *Id.* ¶ 26 (emphasis added). However, Plaintiffs later clarified that they pin their federal claim on alleged racial discrimination directed towards Ms. Carter, from which the Plaintiffs then suffered monetary fines and an assessment of legal fees. Pls.' Supplemental Mem. [Dkt. # 25] ("Pls.' Mem.") 1–2 (stating that the Association violated § 1981 when it "and its representatives targeted [Mr. Perkins] and his tenant with persistent harassment and the mean-spirited, arbitrary and callous imposition of fines and fees because Ms. Carter was a section 8 tenant

and because of her race").

Section 1981 mandates that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2011). The terms "make and enforce contracts" are defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Thus, § 1981's "prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship." *Rivers v. Roadway Express*, 511 U.S. 298, 302 (1994). "[T]o state a claim for racial discrimination under Section 1981, a plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 88 (D.D.C. 2010) (quoting *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C. 2007)).

Plaintiffs concede that Ms. Gregory-Perkins lacks standing to pursue the § 1981 claim. "To the extent Lenya Gregory-Perkins does not possess an ownership interest in 3837 31st Place, N.E. or is a party to the rental agreement with Talatha Carter, plaintiffs do not argue that she maintains standing under 42 U.S.C. § 1981." Pls.' Mem. 1 n.3; *see also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006) (holding "that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'") (quoting 42 U.S.C. § 1981). The Court will dismiss Ms. Gregory-Perkins's claim under § 1981.

Mr. Perkins is the sole owner of record of the unit. Mr. Perkins asserts that as a

"direct and proximate result of th[e] discriminatory harassment [aimed at Ms. Carter], Perkins suffered tangible harm from the imposition of over $4,000.00 in fines and fees and the harassment has impeded his ability to rent out his unit, provide his tenant with the quiet enjoyment of his tenancy, and interfered with Perkins' own enjoyment of his property and contractual rights as an association member." Pls.' Mem. 2. The Court must determine whether Mr. Perkins has standing under constitutional and prudential standards and, if not, whether he has third party standing to raise any claims on Ms. Carter's behalf.

## 1. Article III Standing

"In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth*, 422 U.S. at 498. "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "To satisfy article III's 'case' or 'controversy' requirement, a litigant must 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.'" *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982)).

Mr. Perkins's injuries derive from the Association's imposition of fines and fees and its interference with his contractual relationship with both Ms. Carter and, separately, the Association, because of alleged racial discrimination aimed at Ms. Carter. Mr. Perkins has suffered

an injury-in-fact, wrought upon him by, and traceable to, the Association's putatively illegal conduct, which would likely be redressed by a decision in his favor. Mr. Perkins satisfies the constitutional principles of Article III standing.

### 2. Prudential Standing

"Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers." *Warth*, 422 U.S. at 499. These prudential limits on standing, which must be satisfied in addition to Article III constitutional standards, preclude Mr. Perkins from pursuing his § 1981 claim. Prudential limits on federal jurisdiction are implicated here because "ordinarily, a plaintiff 'must assert his own legal interests, rather than those of a third party.'" *Fair Emp't Council v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (quoting *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 100 (1979).[2] The D.C. Circuit has held that prudential concerns dictate that "standing under § 1981 is restricted to 'the direct victims of the alleged discriminatory practice', at least as long as there is no impediment to suits by those victims." *BMC*, 28 F.3d at 1279 (quoting *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 422 (4th Cir. 1984)); *see also Clifton Terrace Assoc., Ltd. v. United Techs. Corp.,* 929 F.2d 714, 721 (D.C. Cir. 1991) ("Prudential limitations on standing ordinarily require that an action under section 1981 or 1982 be brought by the direct victims of the alleged discrimination because they are best situated to assert the individual rights in question."). As the D.C. Circuit

---

[2] "Federal courts must hesitate before resolving a controversy . . . on the basis of the rights of third persons not parties to the litigation." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). "First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not." *Id*. at 113–14. "Second, third parties themselves usually will be the best proponents of their own rights." *Id*. at 114.

explained in *BMC*:

> In *Clifton Terrace Associates v. United Technologies Corp.*, 929 F.2d 714, 289 U.S. App. D.C. 121 (D.C. Cir. 1991), the owner of a low-income housing complex sued the Otis Elevator Company and its corporate parent for refusing to negotiate a service contract for the elevators in the complex, allegedly because the residents of the complex were overwhelmingly black. The owner plainly had suffered 'injury in fact' as a result of this refusal, for its elevators were deteriorating; indeed, the city government had taken action against it for violating its duties as a landlord. Accordingly, we dealt with the owner's Fair Housing Act claims on the merits. But we accorded a different treatment to the owner's claims under § 1981. Concluding that 'the direct victims of the alleged discrimination are the residents of Clifton Terrace' rather than the owner, we invoked *Mackey* to hold that the owner could not sue under § 1981. [*Clifton Terrace*, 929 F.2d at 721]. Accordingly, our law is now in accord with that of the Supreme Court and other circuits in concluding that § 1981 does not confer a cause of action on persons whose injuries derive only from the violation of others' rights.

*BMC*, 28 F.3d at 1279. Although Mr. Perkins may have suffered an injury-in-fact, he concedes he was not the direct victim of the race-based discrimination; he thus lacks standing on prudential grounds to press a § 1981 claim.[3]

Mr. Perkins argues that Congress may enlarge standing under a statute to persons who suffer an injury but who would not appear to be an intended beneficiary under the statute. *See* Pls.' Mem. 3. He analogizes his claim to cases in which plaintiffs, who were not the direct victims of discrimination but nonetheless suffered a distinct injury as a result of said discrimination, were permitted to pursue claims under the Fair Housing Act. *Id.* at 4. To be sure, courts have noted that

---

[3] *BMC* noted that the holding in *Clifton Terrace* that only direct victims of alleged discrimination have standing under § 1981 "seems to be in tension" with a prior decision, *Gersman v. Group Health Ass'n*, 931 F.2d 1565 (D.C. Cir. 1991), vacated on other grounds, 112 S. Ct. 960 (1992), reinstated, 975 F.2d 886, 900 (D.C. Cir. 1992). *BMC*, 28 F.3d at 1279 n.4. The Court follows the Circuit's more recent analysis.

Congress fashioned the Fair Housing Act to extend standing under the law to the full limits of Article III, so that prudential standing concerns are inapplicable. *See, e.g., Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). However, the same courts juxtaposed the Fair Housing Act's broad standing allowance with the notably stricter standing requirements under § 1981, in which prudential concerns are implicated. *See, e.g., BMC*, 28 F.3d at 1278–1279; *Warth*, 422 U.S. at 512–514. Those concerns warrant dismissal here.

### 3. Third Party Standing

Even though Mr. Perkins lacks standing to pursue the § 1981 claim himself, he appears to attempt to litigate the claim on Ms. Carter's behalf. In limited situations third party standing may exist if the litigant's interests are aligned with the interests of the absent party who was the direct victim of discrimination and the direct victim is unable to bring suit in his or her own right. *See BMC*, 28 F.3d at 1280; *see also Rumber v. District of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010) ("A plaintiff may assert the rights of a third party only when there is 'some hindrance to the third party's ability to protect his or her own interests.'") (quoting *Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999)).

Here, "there is no indication that" Ms. Carter as the direct victim of the alleged discrimination is sufficiently "disabled from asserting [her] own right in a proper case." *See Warth*, 422 U.S. at 510. Plaintiffs testified at deposition that they did not know the whereabouts of the Carters, that they had not had any communication with the Carters since they vacated the unit in September of 2009, and that they had no contact information to get in touch with the family. *See* Pls.' Opp'n, [Attach. 3] Steven Perkins Dep. (Mar. 18, 2010) at 90; *id*., [Attach. 5] Lenya Gregory-Perkins Dep. (Mar. 18, 2010) at 29. Her mere absence is not a legal obstacle which impedes Ms.

Carter's ability to bring suit.  Rather, "[t]he fact that [Ms. Carter] could have brought [her] own

action against [the Association] argues against allowing [Mr. Perkins] to assert [her] rights as a third

party, and we refuse to do so."  *Clifton Terrace*, 929 F.2d at 721.[4]  Moreover, whether a statute

grants a litigant a right of action amounting to third party standing depends on the intent of Congress,

and Mr. Perkins points to no evidence that Congress intended for those in his shoes to be able to

litigate the § 1981 claims of others.  *See Gracey*, 809 F.2d at 810.

       Accordingly, the Court finds Plaintiffs lack standing to pursue the § 1981 claim.

---

[4] Plaintiffs do not argue that the fines are a form of retaliation against them for advocating for the civil rights of another, *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969), yet cite to several cases which stand for this proposition.  *See* Pls.' Mem. 3–4 (citing, inter alia, *Sullivan*, 396 U.S. at 229; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179–80 (2005) (holding that a male school teacher can sue for retaliation under Title IX, 20 U.S.C. § 1681(a), premised on his advocating against the unequal treatment of female students).  "[T]o be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." *Jones v. Wash. Times*, 668 F. Supp. 2d 53, 59 (D.D.C. 2009) (quoting *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998)).

Plaintiffs do argue that *Tillman v. Whaton-Haven Recreation Ass'n*, 410 U.S. 431 (1973), and *Sullivan* are dispositive.  However, *Tillman* did not directly address questions of retaliation or standing, presumably because black residents, directly affected by the discriminatory policy at issue, were also plaintiffs with white plaintiffs.  *See id.* at 434.  In *Sullivan*, a white property owner attempted to assign his share allowing access to a community park and playground facilities to an African-American lessee.  The board of directors for the corporation operating the facilities refused the assignment.  The plaintiff contested the board's decision and was expelled.  *See Sullivan*, 396 U.S. at 235.  "We turn to Sullivan's expulsion for the advocacy of Freeman's cause.  If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982.  Such a sanction would give impetus to the perpetuation of racial restrictions on property.  That is why we said in *Barrows v. Jackson*, 346 U.S. 249, 259, that the white owner is at times 'the only effective adversary' of the unlawful restrictive covenant.  Under the terms of our decision in *Barrows*, there can be no question but that Sullivan has standing to maintain this action." *Id.* at 237.  Not only does Mr. Perkins <u>not</u> argue that he was fined because he was attempting to vindicate the rights of Ms. Carter, there is no indication that this matter falls within those situations in which he would be the only effective adversary to litigate Ms. Carter's claims.

**B. Summary Judgment**

Even if Mr. Perkins had standing to pursue a claim under 42 U.S.C. § 1981, the Court would enter summary judgment for the Association. "A prima facie case of discrimination requires that the plaintiff suffer an adverse action that gives rise to an inference of discrimination." *Middlebrooks v. Bonner Kiernan Trebach & Crociata*, 671 F. Supp. 2d 61, 63 (D.D.C. 2009); *see also Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 18 (D.D.C. 2009) (noting that plaintiff must prove by a preponderance of the evidence that actions taken were more likely than not based on consideration of impermissible factors, such as race). The Association contends that Mr. Perkins was fined because of his, and his tenant's, violations of the Association's Rules and not because of race discrimination. The Rules themselves are not challenged and the undisputed facts indicate that parking spaces were blocked and groceries were spilled. It falls to Mr. Perkins to demonstrate that the Association's proffered reasons are pretextual and meant to hide illegal race discrimination, *see Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008), a burden Mr. Perkins fails to satisfy.

The question is whether Mr. Perkins produced sufficient evidence for a reasonable jury to find that the Association's stated reason for the fees and fines was not the actual reason and that it intentionally discriminated against Mr. Perkins based on Ms. Carter's race. *See Brady*, 520 F.3d at 495.[5] Mr. Perkins does not contest the authority of the Association to levy such fines nor

---

[5] Despite Mr. Perkins's assertion that as a "direct and proximate result of th[e] discriminatory harassment [aimed at Ms. Carter], Perkins suffered tangible harm from the imposition of over $4,000.00 in fines and fees and the harassment has impeded his ability to rent out his unit, provide his tenant with the quiet enjoyment of his tenancy, and interfered with Perkins' own enjoyment of his property and contractual rights as an association member," *see* Pls.' Mem. 2, the evidence only supports an action challenging the fines and attorney fees.

does he contest that he and Ms. Carter violated the Rules.  Instead, Mr. Perkins asserts that the fines

are disproportionate to the underlying conduct and/or completely unwarranted, and were inspired by

racial animus.  However, he fails to point to any colorable evidence in the record to support the claim

that the Association acted against Mr. Perkins because of Ms. Carter's race.  To be sure, the parties

contest portions of each other's version of events leading to the fines but they do not contest that

certain parking spaces were blocked by the moving truck, there was argument, and that Ms. Carter's

son spilled groceries.

　　　　　To avoid the conclusion that race did not provoke the fines and fees, Mr. Perkins

points to Ms. Carter's witness statement, which recounted statements from Ms. Odom on the day Ms.

Carter was moving into the condo, to the effect that Ms. Carter and her sons were "not suppose[d]

to be up here anyway because you are ghetto," and that the complex was for upper-class residents.

*See* Talatha Carter Witness Statement at 4.  Such a statement would be consistent with one recalled

by Ms. Gregory-Perkins, who remembers Ms. Odom stating, when Ms. Gregory-Perkins visited the

condominium before its rental, "If you are thinking about renting [the unit] out, we don't want you

---

Ms. Carter provided a witness statement in which she complained of "neighbors knocking on my door trying to engage me in unwanted conversation;" a neighbor "tried to help me bring groceries in the house" and told Ms. Carter to speak with him if she ever had any problems; one neighbor left notes on her door several times; her mail was once delivered to the wrong unit and was then delivered to Ms. Carter opened; and "neighbors knock on my door to ask me to come have a drink with them."  Carter Witness Statement at 5.  Such conduct gives no inference of illegal harassment, even if it were not inadmissible hearsay. *See Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009) ("On summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the [c]ourt."); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (noting that a plaintiff's statements about another employee's comment was "sheer hearsay" that "counts for nothing" on summary judgment).   In addition, the Carters lived in Mr. Perkins's unit until September 2009, beyond the term of their one-year lease, which undercuts Mr. Perkins's argument that the alleged harassment affected his ability to rent the condominium.

to rent to Section 8 because it will bring the property value down. Collectively, we are trying to keep Fort Lincoln New Town I the upper echelon because the new development, Dakota Crossing, has brought the property value up, and we are trying to keep it that way. Do you know what I mean?" Lenya Gregory-Perkins Dep. at 33. Ms. Odom denies that she made either statement. Assuming without deciding that such statements were made by an African-American to two African-Americans, they suggest hostility based on economic status, not race.[6]

The Association notes that the Fort Lincoln II Condominium complex is in a predominantly African-American neighborhood and that, at the time of Ms. Carter's tenancy, all but one of the 105 units was owned and occupied by African-Americans. Def.'s Reply [Dkt. # 23] at 14. Moreover, at all times relevant to this litigation, every member of the Association's board was African-American, and all individuals complained of, including Ms. Odom and Ms. Bell, are African-American. *Id*. For these reasons, the Association argues that as a "practical matter, it would be impossible for anyone to establish that Ft. Lincoln II enforced its Rules and Regulations in a racially discriminatory manner, because virtually the entire universe of Fort Lincoln II condominium unit owners is African-American." *Id*. (emphasis omitted). Although a person of one race could racially discriminate against someone of the same race, Mr. Perkins fails to proffer evidence that

---

[6] Although the word "ghetto" could constitute a racially tinged attack, the word as allegedly used by Ms. Odom, when viewed in the context of the entire statement, can only be seen as referring pejoratively to low economic standing. In fact, that is how Ms. Gregory-Perkins interpreted the events. *See* Gregory-Perkins Dep. at 14-15 (testifying that Ms. Gregory-Perkins believed that Ms. Carter's treatment by her neighbors was motivated by her economic status, as demonstrated by the fact that Ms. Carter was allegedly told to "go back to where she came from, 'her ghetto ass.'"). Ms. Gregory-Perkins also testified that she believed Mr. Perkins was fined because "Mrs. Carter and her family were Section 8." *Id*. at 25. The residents had told Ms. Gregory-Perkins that "they did not want the property rented out to anyone that is of lower standard because they didn't want the property value to go down," *id.*; Ms. Gregory-Perkins does not believe there was discrimination based on race. *Id*. at 31.

would enable a reasonable jury to find that, in this instance, African-Americans discriminated against Ms. Carter because she is African-American.

Mr. Perkins counters with conclusory arguments that race must have played a role in the Association's actions, but without an evidentiary record in support, he offers no genuine dispute of material facts that might preclude summary judgment. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). If the Association fined Mr. Perkins because the condominium residents opposed Section 8 tenants, upon which this Court does not rule, his claim of a D.C. Human Rights Act violation, based on actual or perceived economic status, might provide a remedy.[7] However, Mr. Perkins has failed to demonstrate that the Association's given reason for its fines was a pretext for race discrimination in violation of 42 U.S.C. § 1981. Accordingly, summary judgment in favor of the Association on Count I of the Complaint is warranted. *See, e.g., Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002); *Sharpe v. Bair*, 580 F. Supp. 2d 123, 129 (D.D.C. 2008).

### C. Supplemental Jurisdiction

As the Court will dismiss Plaintiffs' sole federal claim under 42 U.S.C. § 1981, the Court exercises its discretion to decline supplemental jurisdiction over the parties' remaining claims based on District of Columbia law. *See* 28 U.S.C. § 1367(c)(3); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are

---

[7] D.C. Code § 2-1402.21 prohibits another to "interrupt or terminate, or refuse or fail to initiate or conduct any transaction in real property; or to require different terms for such transaction" on the basis of the person's "actual or perceived" race and source of income. D.C. Code § 2-1402.21(a). The D.C. Human Rights Act further clarifies that "monetary assistance provided to an owner of a housing accommodation under section 8 of the United States Housing Act of 1937 . . . either directly or through a tenant, shall be considered a source of income under this section." *Id*. § 2-1402.21(e).

eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Clifton Terrace*, 929 F.2d at 723 (reversing district court's ruling on plaintiff's claim under D.C. Human Rights Act because "[h]aving found that [Plaintiff] had alleged no substantial federal cause of action under the Fair Housing Act or sections 1981 and 1982, the district court lacked a solid basis for subject matter jurisdiction. It was appropriate under the circumstances for the court to dismiss [Plaintiff's] Human Rights Act claims for lack of pendent jurisdiction rather than to address the merits of these novel nonfederal claims."). Accordingly, the remaining claims will be dismissed without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs lack standing to pursue their sole federal claim under 42 U.S.C. § 1981. Even assuming that Plaintiffs had standing, Defendant would be entitled to summary judgment on this claim. Accordingly, Plaintiffs' § 1981 claim will be dismissed. The Court further declines to exercise supplemental jurisdiction over the remaining claims based on District of Columbia law; they will be dismissed without prejudice. A memorializing Order accompanies this Memorandum Opinion.


Date: May 27, 2011                                   _____/s/_____
                                                     ROSEMARY M. COLLYER
                                                     United States District Judge